JOHN BICKETT AND WIFE, Plaintiffs in Error, *v.* THOMAS WHITE, Defendant in Error.

A. seized of lands occupied by his lessees for terms of years, conveys the fee to B. Subsequently, in B.'s presence, and with his oral acquiescence, A. gives a promise in writing to the tenants of a privilege of purchase of the fee by them on easy terms. B. afterward refuses to recognize the agreement.

*Held*, that under the circumstances A. acted as the duly authorized agent of B., and the written promise was good within the statute of frauds.

That a written agreement, signed by the party to be bound thereby, though only accepted orally by the other party, is good within the statute, and that there is, in such a case, no such want of mutuality as to invalidate the contract.

That where one party refuses to recognize the terms of a contract or to be bound thereby, it is sufficient for the other party, in a suit of specific performance, to prove ability, readiness, and willingness to perform the contract on his own part. No tender need be proved if it were certain to be refused.

ERROR TO SPECIAL TERM.—The facts appear in the opinion of the court.

*F. Ball*, and *Yaple & Healy*, for plaintiffs in error.

*Stallo & Kittredge*, contra.

HAGANS, J. This is a suit for the specific performance of a contract. The evidence in the cause shows that on the 3d of January, 1855, John B. Purcell, Roman Catholic Archbishop of Cincinnati, by John Bickett, his attorney in fact, leased to Thomas White, a lot of twenty by sixty-eight and one-half feet, on the west side of Cutter street, in said city, lying three hundred and fifteen feet north of Court street, and being part of the "Goshorn" property, the title to which was for a long time in litigation, which was ended after the execution of this lease, and the title in fee made perfect in said Purcell. This lease, as well as leases to several other persons, for portions of the same

Bickett and wife *v.* White.

tract, was for thirteen years, at a stipulated rent payable quarterly, and provided that the lessee should put on the premises at his own cost any proper improvements, which, at the end of the term, he was at liberty to remove. It seems the property, both on the east and west sides of Cutter street, between Court and Clark streets, was leased, there being about sixty tenants in all. On the west side of Cutter street the lots were one hundred and thirty-eight feet deep to Kossuth street, and the lot of the plaintiff, numbered eighteen, ran west but half the depth of the lot; the Kossuth street front of lot eighteen being occupied by Mrs. Doyle, who was the assignee of Barney Ganty, running half the depth of the lot east. Bickett was the agent of Purcell to collect the rents and manage the property. On the 31st March, 1855, said Purcell conveyed all his interest in these leases, some sixty in number, including White's lease, to Bickett, who thereafter collected the rents and managed the property in his own right. It appeared that Bickett encouraged the tenants to make permanent improvements on this property, both before and after the assignment to him, under the assurance that when the title to the lot was settled they should have the right to buy the fee at a fair price. As has already been stated, said Purcell obtained a good title to the property. On the 26th of January, 1867, Bickett made a proposition to buy the property from the archbishop which was accepted; and on the 5th of February, 1867, in consideration of $90,000, said Purcell conveyed the same in fee to Bickett, who executed a mortgage to secure the unpaid purchase money. It seems that up to this time these tenants, including the plaintiff, rested upon the faith of the assurances that they should have the right to buy their respective lots as long as the archbishop owned the property, but immediately upon a well-founded rumor of the sale to Bickett they became uneasy. The deed to him was not recorded until the 16th of May, and the mortgage until September 17, 1867. On the 13th of February, 1867, a meeting of the tenants

was called to consider the position of affairs, and it was attended by nearly all of them. Its purpose seems to have been to ascertain the truth and to protect their supposed interests. The meeting refused to allow the mention of Bickett's name, and appointed a committee of five, of which White was one, to wait on the archbishop. On February 14, they presented a written petition to him, and at that time were advised of the fact of the sale. This petition is lost, but its purport was to ascertain from him what the property could be bought at. He assured them he had made provision for them in the sale to Bickett, and answered the petition in writing the same day at their request, signing his own name as archbishop. After advising them that he had given them nearly a year's warning of his purpose to sell, he states that "the renters shall have pre-emption before all others of the ground they occupy. The conditions of sale are the following: The lots on the east side of Cutter street are to be had at $110 a front foot, by one hundred and twenty-six feet deep to Bickett's alley; that is, if they pay as much as they can, say $1,000, before the 1st of January, 1868, as best suits their convenience. If not paid within that time the price will be $120 a foot. * * * On the west side of Cutter $140 a foot front by one hundred and thirty-eight deep, the front part of the lot not to be sold unless it be bought all through. Those who buy a half lot on ·Kossuth street shall have it at $60 a foot front by sixty-eight and one-half feet deep. * * * Those who pay all down shall be allowed a discount the same as has been allowed to Mr. Deagan. The price here proposed has been offered by others, say $150 a foot west side of Cutter street, they who make this offer proposing to build fine substantial brick houses. From six to ten years will be allowed to purchasers who pay down a reasonable sum, say $400, the balance at six per cent."

This written answer was read the same evening at a meeting of the tenants, and the terms therein contained accepted by resolution.

The court below found by the weight of testimony—and this finding we have no disposition to disturb—that this writing was prepared by the archbishop in the presence of Bickett and assented to by him. It was read over to the committee in Bickett's presence and his approval obtained. He afterward disavowed the terms contained in it. It seems Bickett had drawn up propositions of sale dated January 26, 1867, the very day of his purchase from the archbishop. He had effected a sale or two under them, and placed them before the archbishop when he was preparing his answer to the tenants on February 14, and insisted that should be incorporated in that answer. But they were not, and Bickett chose to assent to the terms contained in the answer, stating distinctly to the committee "these are my terms," and the tenants accepted them before any repudiation of them by him, and he was notified of the fact. When he did repudiate the terms, the plaintiff and others of the tenants made tenders to him of the $400 down, which was the payment provided for in the archbishop's answer to the tenants, and demanded a deed before the expiration of the terms of the lease. Bickett refused to receive the money or make a deed, insisting on the terms of his own proposition, which increased the purchase money, required a larger cash payment, and gave but four years to pay balance of purchase money. It also appeared that the plaintiff was able, willing, and ready to comply with all the terms of the alleged contract contained in the archbishop's letter.

The court below found all the issues of law and fact for the plaintiff White, and decreed accordingly; this proceeding is prosecuted to reverse that judgment.

Several errors are assigned, but we suppose only those argued are insisted upon. There is one principal question which controls the case as presented to us:

Is there here a valid contract, binding between the parties, and one which equity will enforce?

It is objected that these tenants accepted the archbishop

as the responsible party during the time subsequent to his conveyance to Bickett, and that, though acting as the agent of Bickett, in the matter of the meeting and the contract, they elected to hold him, and can not now sue Bickett. This is a conclusion of fact we think not warranted by the testimony. These tenants simply looked to the influence of the archbishop with Bickett to carry out what on all sides was admitted to be just, and in what he did he in fact represented Bickett and was his agent thereunto duly authorized, though Bickett was present. The testimony clearly shows both before and at this meeting, and afterward, in all applications by these parties to the archbishop, they were continually remitted to Bickett. They dealt with him accordingly, negotiating with him and tendering him the money, and requiring deeds from him. This view disposes of the authorities cited to this point.

It is said that there is no such a thing in Ohio as the verbal acceptance of a proposition in writing signed by the party to be charged thereby, where it is otherwise unobjectionable; that in such a case there is no mutuality, and the case of *Ohio* v. *Baum*, 6 Ohio, 383, is cited in support of these propositions. But we do not think this case by any means supports the statement. On the contrary, we think that the resolutions passed at the meeting of the tenants, on the evening of February 14, accepting the terms of the archbishop's letter, in which the plaintiff participated, are sufficient to make this a good valid contract, which either party could enforce specifically, if otherwise there be no objection to it. (4 Kent's Com. 451; Fry on Specific Performance, sec. 181 *et seq.*, sec. 295; *National Insurance Company* v. *Loomis et al.*, 11 Paige, 431; *Fletcher* v. *Bulton*, 4 Comst. 396.)

Brown on Frauds, section 366, states that it was at one time doubted whether a memorandum of an agreement signed by one party only could be enforced against the other; "notwithstanding this doubt, however, the rule is firmly settled that in equity for obtaining a specific per-

formance, as well as at law for recovering damages, the signature of the party making the engagement is all that the statute requires." In addition to the unqualified language of the statute itself, the plaintiff by filing his bill has made the remedy mutual. We consider it no longer an open question. See 3 Parsons on Contracts, 9, and cases cited. Indeed, in Ohio, if a parol contract for the purchase or sale of lands is admitted by the defendant, without relying on the statute of frauds for a defense, performance will be decreed. (*Anderson* v. *Harold*, 10 Ohio, 399; *Woods* v. *Dille*, 11 Ohio, 455.) Again, it is urged that when the archbishop wrote that letter, purporting to contain the terms of the agreement, that Bickett ought not to be bound by it, because he either did not understand it, or intend to make it, or was mistaken as to its real purport. But the evidence clearly negatives this idea.

We think this a sufficient memorandum in writing to charge Bickett and to authorize a decree of specific performance. The contract is complete in all essential respects. There is a valid description of the subject matter, the parties to the contract, the price and the terms, and nothing is left open to future negotiations. And there is nothing in the circumstances surrounding the parties at the time sufficient to authorize us to come to any different conclusion than that reached by the judge at Special Term.

The testimony sufficiently showed that the parties, including the plaintiff, were able, ready, and willing to comply with the contract, and that they made a tender, which perhaps, by itself, might be insufficient if the testimony did not clearly show also that Bickett refused to be bound at all by, or to recognize, the terms of the contract as set forth in the archbishop's letter, but insisted upon other and different terms. Under these circumstances, mere ability, willingness, and readiness to perform would be sufficient. Any tender of money made by the plaintiff would have been refused, if made according to the contract; and this is enough to render such a tender unnecessary. The law

does not require a party to do a vain thing. (Fry on Specific Performance, sec. 619; *Isham* v. *Greenham*, 1 Handy, 355.) Besides, there seemed a design on the part of Bickett to avoid giving the plaintiff an opportunity to make a tender, and it is too late now to object on his part that no tender was made. (*Gilman* v. *Holt*, 4 Pick. 258; *Southworth* v. *Smith*, 7 Cush. 391.)

Some stress, at the argument, was laid on the clause in the archbishop's letter which allows purchasers from six to ten years, at six per cent., who pay down $400. We think the fair construction of this clause, as in any other alternative obligation, gives to the plaintiff his election, which he has made, to take ten years to pay the balance of the purchase money in; and that it is meant that the payment may be in equal annual amounts with interest. (2 Parsons on Contracts 657, and notes; *Layton* v. *Pearce*, 1 Douglas, 16; *Choice* v. *Mosely*, 1 Bailey, 136; *McNott* v. *Clark*, 7 Johns. 465; *Smith* v. *Sanborn*, 11 Johns. 58; *Small et al.* v. *Quincy et al.*, 4 Greenl. 497.)

Inasmuch as nothing was said in the contract about a deed or mortgage, the judge at Special Term did not require a mortgage to be executed for the deferred payments, nor a deed to be executed until all the payments were made; but allowed the title to stand in Bickett by way of security to him.

On the whole case, the judgment of the court below will be affirmed.